Per curiam.
This is a subsequent application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071, § 5.
Applicant was convicted of murdering Joana Rodriguez in the course of kidnapping her. Prior to the instant offense, Rodriguez was pregnant and was living in the same apartment complex where Applicant resided. Applicant told people that she wanted Rodriguez's baby and that she was going to "cut the baby out" of her. Applicant recruited a group of men to break into Rodriguez's apartment to commit robbery and kidnap Rodriguez. These men included Christopher Robinson, Gerald Anderson, and Carliss Williams. A fourth man, Marvin Caston, was involved in their discussions but did not participate in the home invasion.
Robinson, Anderson, and Williams kicked in the door of Rodriguez's apartment after midnight on May 16, 2001, while Applicant waited outside. When the men entered the apartment, they became aware that Rodriguez had already given birth to a baby boy. They beat and bound Rodriguez's husband and another male relative. Rodriguez was brought outside and placed in a car trunk, and Applicant took the baby. The group drove to a residence where Applicant instructed the men to tie up Rodriguez. Williams opened the trunk, *150 taped Rodriguez's mouth and hands, then shut the trunk. Another man, Zebediah Combs, was present at the residence and saw Rodriguez inside the car trunk.
Robinson testified at trial that he, Anderson, and Williams left the residence. When Robinson returned, he saw that the car trunk was open. He testified that Rodriguez was face down in the trunk and Applicant was holding a plastic bag over her head. Robinson testified that he tore open the bag and observed that Rodriguez was dead.
Police later questioned Applicant about the disappearance of Rodriguez and her baby. Charles Mathis, a Drug Enforcement Administration (DEA) agent with whom Applicant had worked as a confidential informant, was present while she was being questioned. Applicant thereafter led police to the residence where the baby and Rodriguez's body were located.
Robinson, Caston, Combs, and Mathis testified for the State at Applicant's trial. The jury found Applicant guilty of the offense of capital murder in February 2002. See TEX. PENAL CODE § 19.03(a)(2). At punishment, the jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, and the trial court, accordingly, set Applicant's punishment at death. This Court affirmed Applicant's conviction and sentence on direct appeal. Carty v. State, No. AP-74,295, 2004 WL 3093229 (Tex. Crim. App. April 7, 2004) (not designated for publication). This Court denied relief on Applicant's initial post-conviction application for writ of habeas corpus. Ex parte Carty, No. WR-61,055-01 (Tex. Crim. App. March 2, 2005)(not designated for publication).
Applicant presents six allegations in her -02 writ application in which she challenges the validity of her conviction and resulting sentence. We remanded this application for the trial court to consider three of Applicant's claims:
A. Whether Applicant's right to due process was violated by the State's presentation of false and misleading testimony at trial, in violation of her rights to due process and due course of law under Giglio and Napue.
B. Whether Applicant's right to due process and due course of law was violated by the State's presentation of false and misleading testimony against her at trial, in violation of her rights under Chabot and Chavez.
C. Whether Applicant's right to due process was violated by the State's failure to disclose impeachment and exculpatory evidence in violation of Brady v. Maryland.
Applicant specifically asserts in Claims A, B, and C that the prosecutors coerced Robinson and Caston to testify falsely at trial, that they threatened Anderson and Mathis, and that they failed to disclose impeachment and exculpatory evidence with regard to Robinson, Caston, Anderson, and Mathis.
After holding a hearing on Claims A, B, and C, the trial court made findings of fact and conclusions of law recommending that those claims be denied. This Court has reviewed the record with respect to those allegations. Based upon the trial court's findings and conclusions and our own review, we deny relief on Claims A, B, and C.
In Claims D and E, Applicant contends that the "cumulative impact of the constitutional errors" violated her state and federal constitutional rights to due process and due course of law. In Claim F, Applicant contends that she "is actually innocent and her conviction and death sentence *151 therefore violates the Eighth and Fourteenth Amendments to the United States Constitution." With regard to these claims, we find that Applicant has failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, we dismiss Claims D, E, and F as an abuse of the writ without reviewing the merits of those claims.
Applicant has also filed in this Court a "Motion for Remand and Alternatively, Motion to Stay." Applicant asserts in this motion that the State failed to disclose to defense counsel that it had a deal with Combs in exchange for his trial testimony. This claim, which was not contained in the instant writ application, was raised by Applicant during the post-remand hearing in the trial court. Because we do not have jurisdiction to review this claim, we deny Applicant's motion to remand this application to the trial court for consideration of the merits of the claim.
IT IS SO ORDERED THIS THE 7TH DAY OF FEBRUARY, 2018.
Richardson, J., filed a concurring opinion in which Hervey and Walker, JJ., joined. Walker, J., filed a concurring opinion in which Hervey, J., joined. Alcala, J., concurred. Newell, J., did not participate.
RICHARDSON, J., filed a concurring opinion in which HERVEY and WALKER, JJ., joined.
CONCURRING OPINION
Applicant Linda Carty was convicted of the capital murder of Joana Rodriguez. She was sentenced to death in 2002. In this subsequent state habeas application, which was filed on September 10, 2014, Carty contends that newly discovered evidence shows that the State (1) knowingly used false testimony and (2) suppressed exculpatory evidence. Carty also filed a Motion to Remand. Today, this Court dismisses three of Carty's habeas claims as procedurally barred, denies the remaining three habeas claims on the merits, and denies Carty's motion for remand. I agree with the Court's decision.
BACKGROUND FACTS[1]
On or about May 12, 2001, Raymundo Cabrera and Joana Rodriguez brought home their new baby boy, Ray. They shared their apartment with Cabrera's cousin, Rigoberto Cardenas. Carty and her boyfriend, Jose Corona, had lived in the same apartment complex in a unit very close to Cabrera's and Rodriguez's.
At 1:00 a.m., on May 16, 2001, Carty and three men went to the apartment complex. Those three men were Chris Robinson, Carliss "Twin" Williams,[2] and Gerald "Baby G" Anderson. Carty had driven to the apartment complex in a separate car and waited in the parking lot while the three men kicked in the door of Cabrera's and Rodriguez's apartment. The men beat Cabrera and taped his hands and feet together. Anderson taped up Cardenas who was asleep downstairs. They told Rodriguez to bring her baby outside and come with them. Williams and Anderson brought *152 Rodriguez out of the apartment and put her in the trunk of Robinson's car. At some point Carty took the baby and put him in her car. The group left the complex with the baby and Rodriguez and met up at a storage unit. They moved Rodriguez to the trunk of Carty's car. Then they all went back to a house on Van Zandt where Robinson's half brother, Zebediah Comb (also known as "Jerome") and their grandmother lived. Williams taped Rodriguez's mouth and hands and closed the trunk. At some point the three men left, believing Carty would leave in her car (with Rodriguez in the trunk). Robinson returned to the house and said he saw Carty part-way in the trunk of her car. He said she "had [a plastic] bag over the lady's head." Carty and Robinson closed the trunk and left her car at the house. Robinson then drove Carty and the baby to a hotel room that Carty had rented and stocked with baby items. In the meantime, the police had been called to the crime scene. One of the witnesses they interviewed was a neighbor, Florencia Meyers, who tipped them off to Linda Carty's possible involvement based on Carty's odd behavior regarding having a baby. Thus, when Robinson and Carty were on the way back to the Van Zandt house, the police contacted Carty. She went to meet the police at the police station, and Robinson and the baby went back to the Van Zandt house.
When Carty was interviewed by the police, she told them that she had loaned a car she had rented to a group of men who must have been involved in the kidnapping of Rodriguez and her baby. She maintained that she knew nothing of their plan. She agreed to take the police to where she believed the car would be. When she and the police arrived at the Van Zandt house they found the baby alive in a car registered to Carty's daughter, and they found Rodriguez dead in the trunk of Carty's rental car.
After Robinson was arrested he was interviewed twice by police on the day after the murder (May 17, 2001). In his interviews, Robinson repeatedly said that Carty had manipulated the men into helping her take the baby. He said that Carty "conned" the men into believing that they were breaking into a drug dealer's apartment, but they didn't find any weed. He then said that after they broke into the apartment, Carty wanted them to kill everyone in the apartment and take the woman and the baby. According to Robinson, Carty lied to them because she wanted the baby. Robinson told the police that Carty had already bought a lot of baby clothes. Robinson also said that Carty was trying to "suffocate the lady" because "she had a bag around her head and the bag was stuck to her face." He said Carty talked about wanting to kill the lady, and burn her body.
Marvin "Junebug" Caston gave a police interview the next day, on May 18, 2001. In his interview, Caston said that he met Carty through his girlfriend, Josie Anderson. They met on Mother's Day (May 13, 2001), and he, Josie, Carty, and Chris Robinson got some weed and got high together. He noticed that there were a lot of "baby things" in the car (a baby stroller and a baby bag). Then they went to Zebediah Comb's house to "chill" for the day. Caston said that while they were at Comb's house Carty told them about a "lick" for 1000 pounds of weed. Then he said she started talking about having a baby. Caston said that she was "talking all crazy talking 'bout, well, I got a baby." He also said that "she was talking 'bout cutting the 'ho, cutting the lady and all that noise." Caston said Carty said "she wanted her baby." He said that Carty told them her husband was having an affair with the woman. Caston said he realized that it was "all about some jealousy thing," and "ain't *153 'bout no weed or nothing else." Caston said Carty kept calling him but he wouldn't answer. The police were trying to find out from Caston who the other men were who were with Robinson, but Caston did not know about Carliss Williams and Gerald Anderson.
Josie Anderson was also interviewed by the police on May 18, 2001. She said Carty told her "she was fixing to have a baby .... And then she start talking about that she wanted to take somebody's baby." She said she knew Carty as "Linda Corona." Josie told police that she was in Carty's car and she saw "a bunch of baby stuff.... And she asked me do I know anybody that'll kidnap somebody." Josie told police that she thought Carty was "crazy" and that she "ain't fixing to be a part of no bull shit like that." Josie confirmed that they picked up Chris Robinson and Junebug (Caston), and Carty was talking at first about the lick:
She was talking. She was going on to Bug and them about it. She was like, and they was, she was like, well, I'm looking for somebody that I can pay, first it was about a lick. It wasn't about a baby. You know what I'm saying? With them at first. It was supposed to have been a lick. Like I told you, it was supposed to have been 200 pounds or something like that in the house or some keys or something. She say, uh, that she looking for somebody to hit a lick. And she talked to him about it. You know? And after I got home and she dropped me off, you know? We had our, we passed our words and I told her, bitch, you can keep that shit away from me. You know, because I don't wanna have nothing to do with that. And after we passed our words, I guess she thought I was mad 'cuz I was mad and I was like, bitch. I'm not fixing to be involved in the kidnapping or none of that shit to nobody's baby. You know? So she say, alright. And she left. After that? I don't know nothing about what this lady did. Only thing I kept hearing was a lot of people talking about a lick, a lick, a lick.
Josie confirmed that on that Monday night before the kidnapping (May 14, 2001) she, Chris, Junebug and Carty went to the apartment complex to talk about the lick and so Carty could show them "where everything was." Josie said that at that time Chris and Junebug did not know they were being recruited to kidnap a lady and her baby. And they did not do the lick that night because "she got scared because the lights was on and somebody's window was up." Josie said that neither Chris nor Junebug wanted to have anything to do with kidnapping a baby. "They was just gonna go up in there and get the weed. And come outta there and leave."
The State presented evidence at Carty's trial to support the theory that Carty orchestrated the kidnapping and murder of Rodriguez because she wanted a baby and that she solicited individuals who would help her kidnap a newborn. When Carty took the police to the Van Zandt house, baby Ray was found alive inside a small black Chevrolet owned by Carty's daughter. Also found in the Chevrolet were a live .38 caliber round, a receipt from the Hampton Inn, a pair of life uniform medical scissors, a stethoscope, and name badge, a blue nurse's pin with a blue cord, and numerous baby items, including a diaper bag, a changing pad, a bottle holder, disposable diapers, a pacifier, infant clothing, disposable bottles, infant formula, Gerber washcloths, a hooded towel, and a baby stroller. Rodriguez's body was found in the trunk of a Pontiac Sunfire that had been rented to Carty that was also parked at the Van Zandt house.
At trial, the following accomplice witnesses *154 [3] testified:
Josie Anderson : A friend of Carty's. Josie saw that Carty had purchased a baby car seat, a diaper bag with baby items, and items from the medical supply store-a stethoscope, nurse's scrubs, and a pair of surgical scissors. Carty told Josie that she had planned a "lick" (a robbery where you kick in the door) of an apartment where there was a pregnant lady and her husband. Josie and Carty recruited Josie's boyfriend, Christopher Robinson, and his friend Marvin "Junebug" Caston to participate in the "lick." Carty told the group that she wanted the woman's baby and was going to cut it out of the lady. Josie thought that Carty "was crazy" and decided not to participate in either the home invasion or the kidnapping.
Marvin Caston: (Also known as "Junebug"). The group helping Carty with the "lick" did not believe they were going to do anything to Rodriguez or to the baby. A couple of days before the kidnapping, Carty picked up Caston and was "really, really talking about the baby thing." Carty told Caston that "she just wanted that specific baby because she was saying that her husband was having an affair with the woman." Caston testified that Carty said she "wanted to cut the baby out because she is not knowing that the baby was already born." Carty was living in a hotel because she had moved out of her apartment. Caston carried a baby bag into the hotel room for Carty. When Josie and Carty showed up at Caston's mother's house where Caston was staying, he had his mother tell them he wasn't home. Caston did not participate in the "lick."
Chris Robinson : He testified at trial that he had not been promised anything or threatened with anything. He said that the first time he met Carty was on Mother's Day (May 13, 2001) when she was with Josie and "Junebug" (Caston). Carty was organizing a "lick." She told them about Rodriguez ("the lady") and the baby. Carty told them to kill everyone and take the pregnant lady so she could cut the baby out of the lady. He said the plan was for him (Robinson) and Twin (Williams) to kick in the door. Baby G (Anderson) was with them. Anderson and Twin brought the lady out and Carty had the baby. Anderson put the lady in the trunk, then they drove to a storage unit, and Anderson put the lady in Carty's trunk. Then they all met again at the Van Zandt house and Carty had the baby. The three men were mad at Carty because they felt that she used them. There was no marijuana at the apartment. They were there just to kidnap the lady and the baby. Robinson said that Carty was the one who instructed them to tape up the lady and close her in the trunk. They talked about shooting Carty and letting the lady go, but then the men left the house. When Robinson returned he saw Carty doing something in the trunk. When he got closer he saw that Carty had put a *155 bag over the lady's head. Robinson tried to rip it off but the lady was already dead. Robinson then took Carty to her hotel and it was full of baby clothes and baby things. He ended up taking the baby back to the Van Zandt house and leaving him in his car seat in the air conditioned car.
Zebediah Comb : He was Robinson's half-brother and lived with their grandmother at the Van Zandt house where Rodriguez's body was found in Carty's rental car. Comb was on electronic monitoring house-arrest for the federal offense of bank robbery and could not leave the Van Zandt Street address where he lived. Before the incident, the group that was preparing for the "lick" came to the Van Zandt address to pick up Robinson. Comb testified that Carty "had a job" for them to do involving a drug deal, and "for the drug deal she wanted a favor in return." The favor was to "bring the lady to her," and Carty was "going to handle it from there." Comb testified that he was present for conversations about the lick on May 13, 2001, that he helped recruit Carliss "Twin" Williams on May 15, 2001. Comb said he was also present when Rodriguez was brought to the Van Zandt house late that night, after the kidnapping. He testified that Carty said "I got my baby." Comb said that he saw Rodriguez in the trunk of Carty's Pontiac and refused her request to put Rodriguez in another car parked in the yard. Comb testified that the men were angry at Carty because there was no money or drugs in the house. Comb told Carty and the men that they needed to get in their cars and leave, but Carty refused to drive her car with the woman in the trunk. Comb testified that when he awoke the next morning Robinson was there, and Carty arrived about twenty minutes later driving a black Chevrolet with a baby in the car. He also said that Rodriguez's body was in the Pontiac's trunk and she was bound with tape with a torn bag over her head. Comb also testified that Carty was talking about disposing of the body by burning it. Carty then left again and returned one to two hours later with the baby. Comb said he saw Robinson, Carty, and Anderson putting together packets of fake and real money to use in ripping off a dope dealer. Then Carty, Robinson, and the baby left in the Chevrolet and Anderson and another man left in a different car. Robinson returned with the baby about three hours later, and he left the baby in the Chevrolet with the air conditioner running. Comb said that Robinson then used Lysol to wipe down the cars.
Neither Gerald "Baby G" Anderson nor Carliss "Twin" Williams testified at Carty's trial.[4] The non-accomplice witness testimony at trial showed that Carty's stories about being pregnant and having a baby coincided with the kidnapping of baby Ray. At trial, the following non-accomplice witnesses testified:
Florencia Meyers: A resident of the same apartment complex who had seen Carty sitting in her car at the apartment complex a day before the kidnapping. Carty told Meyers that she was going to be having a baby the next day.
*156 Sherry Bancroft: A Public Storage employee where Carty had a storage unit. She testified that on May 12, 2001, Carty told Bancroft that she was in labor and expecting a baby boy. Bancroft said that she saw Carty again on May 15, 2001 between 6:30 and 7:30 in the evening. Carty told her that the baby was at home with the father, and she left with a baby blanket and two sets of clothes.
Denise Tillman: She worked at a Houston medical uniform store. She testified that Carty visited the store on May 12, 2001, and bought a number of items, including a blue pen, a nurse's ID tag, a stethoscope, surgical scissors, and two scrub tops and scrub pants.
Jose Corona: The record refers to him as both Carty's boyfriend and husband. They had lived together for two-and-a-half years, but Corona moved out of the apartment before the kidnapping and murder. Carty had engaged in a pattern of telling Corona she was pregnant, then would never give birth. She would not take him to the doctor with her, she never appeared pregnant, and so Corona "was tired of lies" and decided to leave. On the day before the kidnapping, Carty called Corona "many times" to tell him that she was going to have a baby boy the next day. She also called him on May 16th to tell him that the baby would arrive that day.
Charlie Mathis: A DEA agent who had occasionally used Carty as a confidential informant some time before the offense occurred. He testified for the State. He said that he had known Carty for eight to ten years. Mathis said that in 1994 or 1995 she was "closed out," which meant that she was no longer on the books of the DEA as a confidential informant. Nevertheless, Carty would still contact Mathis from time to time with tips. Some time in 2001 Carty told Mathis that she gave birth to a boy. He said he was confused because the timing was off, and her husband did not seem to know about the baby. On the day of the kidnapping, Carty called Mathis and asked him to come to the police station. The police had also contacted Mathis to help interview Carty. Mathis said that when he arrived at the police station, he told Carty that she needed to tell the police anything she knew about the location of Rodriguez and baby Ray. Carty told Mathis that she had given two cars to people that she feared were involved in the kidnapping. She took the police to an address on Van Zandt Street where there was a car parked with baby Ray inside. There was another car parked there that had Rodriguez's body in the trunk. The police arrested Carty and other individuals who were at the Van Zandt address.
On cross examination, Mathis testified that he did not believe Carty was involved in the kidnapping. He also testified that he did not believe Carty would do something like this. When defense counsel asked if Carty was a "good informant," Mathis said he had "no way of measuring who is good and who is not." Mathis said that Carty was generally truthful but that there were times when he felt that Carty "wasn't as truthful as she should have been."
Dr. Paul Shrode, an assistant medical examiner, testified as to the cause of Rodriguez's death. Dr. Shrode testified that Rodriguez died as the result of a "homicide suffocation." He said that her airway was compromised, and it could have resulted from the tape over her mouth, or the *157 plastic bag taped around her neck, or her body position in the trunk.
The jury instructions allowed for Carty's conviction as the principal actor or as a party to Rodriguez's capital murder. The jury found her guilty of capital murder on February 19, 2002.
The prosecution then called several witnesses in order to prove that she should be given the death penalty. The prosecution showed that Carty was guilty of auto theft and drug offenses, and earlier testimony strongly questioned her credibility. The defense called witnesses in an attempt to show that Carty would not be a future danger. The defense also sought to place mitigating circumstances before the jury.
There were three punishment special issues. The second special issue presented to the jurors asked them if they found, beyond a reasonable doubt, that Linda Carty actually caused the death of Joana Rodriguez. In the alternative scenario where Linda Carty did not actually cause the death, the second special issue asked if she intended to kill Joana Rodriguez, or if she anticipated that a human life would be taken. The jury answered the three special issues in a manner requiring the imposition of a death sentence, and she was sentenced to death on February 21, 2002.
PROCEDURAL HISTORY
A. Direct Appeal
This Court affirmed Carty's conviction and sentence on direct appeal on April 7, 2004.[5] Carty asserted in her appeal that her conviction rested exclusively on uncorroborated accomplice-witness testimony. This Court held that, after eliminating all of the accomplice testimony from consideration, the remaining portions of the record contained evidence that tended to connect Carty with the commission of the crime in satisfaction of Article 38.14.[6] On direct appeal, Carty also complained about not being able to fully cross-examine Robinson and Comb using their prior inconsistent videotaped statements. This Court held, however, that Carty was permitted to impeach Robinson and Comb with the contents of their statements made to the police. Additionally, she was allowed to call to the stand the officers who took the statements to question them regarding their inconsistencies. This Court held that Carty failed to show that the videotaped statements had impeachment value or that her right to cross-examination was improperly limited.[7]
B. Previous Writ Applications
Carty's first state writ application was filed on August 6, 2003. On December 2, 2004, the trial court adopted the State's proposed findings of fact and conclusions of law. This Court denied Carty's claim for state habeas relief on March 2, 2005, adopting the trial court's findings, conclusions, and recommendation.[8]
Carty then filed, on February 24, 2006, a comprehensive federal petition alleging ineffective assistance of counsel, trial court error, and prosecutorial misconduct. Although *158 some of the claims Carty brought in her federal writ were procedurally barred because they had not been exhausted in state court, the federal district court addressed the merits of those claims "[i]n the interests of justice," and held that Carty was not entitled to relief.[9]
In her federal writ, the federal district court addressed the factual basis for her claims of trial error, prosecutorial misconduct, and ineffective assistance of counsel. The federal court held that the prosecution's actions did not call into doubt the integrity of Carty's conviction or sentence, and thus did not substantially affect her right to a fair trial.[10] The prosecutorial misconduct claims were not the same as those raised in this writ application. However, one of Carty's ineffective assistance claims asserted that her lawyer should have interviewed Charlie Mathis before trial and should have elicited testimony from Mathis (1) that Carty continued to work for the DEA even though she was no longer on the books, (2) that he would not have used someone like Carty as a confidential informant if he thought she was a compulsive liar, and (3) that he would have urged the jury not to give her a death sentence had he been called to testify during punishment.[11] The federal court held that Mathis "repeatedly stated" at trial that Carty was not a confidential informant at the time of the murder. Moreover, with regard to the claim that trial counsel should have explored Mathis's opinion that Carty was truthful, trial counsel did ask Mathis if Carty was "a good informant." Mathis responded that Carty "was truthful when she told [him] some of the things he was looking for," and that there were "times when [he] felt that maybe she wasn't as truthful as she should have been."[12] The federal court pointed out that "trial counsel asked the question [Carty] blames him for not asking, and did not receive a completely favorable response."[13] Finally, the federal court pointed out that Carty's "hope that Mathis would urge the jury not to give her a death sentence is similar to his guilt/innocence testimony that he did not believe [Carty] was capable of committing the crime."[14] Thus, the federal court concluded that Carty "[did] not show[ ] that additional pre-trial discussion with Mathis would have helped her case."[15]
After exhaustively reviewing Carty's claims for relief, the federal district court denied her federal petition for relief and held that Carty did not show that constitutional error infected her trial. The federal district court's judgment was affirmed by the Fifth Circuit.[16] Specifically as to Mathis, the Fifth Circuit held that Mathis's opinion in the affidavit in support of the federal writ that Carty "is not a violent person, let alone a cold-blooded murderer" was "relatively unpersuasive" and "cumulative."[17] The Supreme Court denied Carty's *159 petition for writ of certiorari.[18]
C. This Subsequent Writ Application
In this subsequent state habeas application, which was filed on September 10, 2014, Carty contends that newly discovered evidence shows that the State (1) knowingly used false testimony and (2) suppressed exculpatory evidence. With her subsequent application, Carty submitted affidavits signed by Charlie Mathis, Marvin Caston, Chris Robinson, and Gerald Anderson. In their affidavits, the four men claimed as follows:
Charlie Mathis: Charlie Mathis executed two affidavits. The first one was dated October 5, 2005. It appears that this affidavit was available and used to support Carty's claims raised in her federal writ application. In the 2005 affidavit, Mathis states, in pertinent part, that:
• Carty was an effective and helpful confidential informant
• Through the years of working with her he got to know her very well.
• In May of 2001 he was called by HPD to come speak to Linda regarding her possible involvement in the abduction of Joana Rodriguez.
• He expressed concern that Carty had not been read her Miranda rights even though it was clear to him that she was in custody.
• He was called as a witness in Carty's trial by the prosecution. He never spoke with Carty's attorneys about what he was going to testify about. He spoke briefly with Carty's attorney during the trial but not about his testimony. He found it "odd" that Carty's attorneys never attempted to contact him.
• He did not want Carty to get the death penalty. He did not think she deserved the death penalty. She is not a violent person. She is not a cold-blooded murderer.
• Though she might have been capable of exaggeration, he did not believe her to be a "compulsive liar."
• He would have been willing to testify that Carty should not have gotten the death penalty. He did not believe her to be a future danger. He would have testified that he did not believe Carty was capable of killing another human being.
• He would not have employed Carty as a CI if he had felt she was capable of murdering someone.
• Had Carty's counsel approached him he would have worked with them on her defense.
In his second affidavit, executed on September 8, 2014, Mathis made the following additional assertions:
• He has avoided speaking to Carty's defense team because he has "serious and on-going health complications," and "this case is a source of stress and difficulty" for him.
• When he came to the station on May 16, 2001, he asked Lt. Smith if Carty had been read her Miranda rights. Smith said she had not because he didn't want her to "lawyer up."
• After Carty disclosed where Rodriguez and the baby were, HPD still did not go to that location. They continued to attempt to extract a confession from her.
*160 • Mathis wanted to leave HPD because he could not condone the tactics they used.
• When Connie Spence contacted Mathis he told her he did not want to testify against Carty. He said he told Spence he had known Carty a long time and she did not have it in her to kill anyone.
• He said that "Spence provided [him] with no option to testify against Linda: Spence threatened [him] with an invented affair that [he] was supposed to have had with [Carty]."
• When he told Spence that he did not want to testify, he said Spence told him "you don't want me to cross examine you about any inappropriate relationship with Linda Carty do you?"
• Mathis said he never had an inappropriate relationship with Linda Carty, and that Spence invented the whole concept.
• He felt Spence was threatening and blackmailing him into testifying.
• He said Spence limited his testimony and wanted him to testify only to a very tight set of facts.
• He told Spence that it didn't "ring likely" to him that Linda would be able to persuade these men to put their lives on the line purely on the word of someone they did not know.
Marvin Caston: By affidavit dated February 20, 2014, Caston ("Junebug") stated as follows, in pertinent part:
• When he was arrested and taken into custody, he was young and scared. He could not remember when he met Linda Carty, but he said he met her on Mother's Day (May 13, 2001) because that is what the police wanted him to say.
• Although he testified at trial that the first time he met Goodhart and Spence was in January 2002 in Spence's office, that was not true. He met with them when they came to his sister's apartment in 2001.
• When Spence and Goodhart talked to him in 2001 in his sister's apartment, they told him how to testify. They said if he did not testify exactly how they wanted, they would see that he was convicted and given thirty years.
• He said that each time he met with Spence and Goodhart they would threaten him with a thirty-year sentence unless Carty got the death penalty and Robinson got thirty to forty years.
• He said that Goodhart and Spence rehearsed his testimony with him so much that he ended up saying untrue and misleading things at Carty's trial.
• He said that Josie Anderson had brought up the lick first, and that Josie was the ringleader, not Carty.
• He said that there was never a plan that Carty was going to be a part of the lick, but Spence and Goodhart made him testify that she was.
• He said that there was never a plan to take Rodriguez or the baby from the apartment, but Spence and Goodhart kept pushing their own version of the story.
• Caston said that Rodriguez's death w as an accident.
Gerald Anderson: By affidavit dated September 2, 2014, Anderson, who did not testify at trial, stated in an affidavit as follows, in pertinent part:
*161 • In July 2001, he was arrested in connection with this case.
• The HPD officers who interviewed Anderson told him that "everyone" had snitched on him for this capital murder.
• He said Spence and Goodhart told him he needed to get on the witness stand and say he was present when Carty said she was going to "cut the baby out of the bitch," but he said he never heard Carty say that.
• He said Spence told him that he had to say they had a plan to take the lady and the baby. He said there was never any plan to take the lady and the baby.
• He said Robinson contacted him about a lick. He said he never talked to Carty.
• He told Spence he would not lie on the witness stand.
• He said if he testified Spence would make his drug charge go away. But ultimately, he would not, and did not, testify.
Chris Robinson: By affidavit dated September 3, 2014, Robinson stated in an affidavit as follows, in pertinent part:
• Each time the police interviewed him, before they turned on the tape recorder, they would tell him what they wanted him to say.
• Detective Novak told him that Linda Carty had snitched on him.
• Robinson said that Spence and Goodhart had "threatened [him] and intimidated [him]." He said they made it clear what he had to say at Carty's trial.
• They coached him and threatened him.
• He told them that he had not seen Carty put a bag over Rodriguez's head, but they wanted him to testify that he had seen Carty kill Rodriguez by putting a bag over her head.
• Robinson told them that Carty had not told them to kill the men in the apartment, but "this was a detail that got included at trial through the various rehearsals with the District Attorneys."
• He told them that Carty never instructed anyone to tape up Rodriguez, but this was what he ultimately said at trial.
• Spence and Goodhart wanted him to say he'd seen Carty bathing the baby, but he didn't see that.
• Robinson said that Josie Anderson was the ringleader, not Carty.
• He said that Rodriguez was not dead in the trunk of the car. When he ripped the bag that was on her head she was breathing.
• When they were using Lysol to clean the car for prints, that is when he saw that Rodriguez was dead.
• No one intended for Rodriguez to die. There was never a plan to kill anyone. This was an accident.
Because these affidavits were dated after Carty's first writ application had been filed, this Court decided that the three claims raised in Carty's writ application that were based on these affidavits are not barred by the subsequent writ provision in Article 11.071, § 5.[19] By order dated February *162 25, 2015, we remanded the case to the trial court for consideration of three claims:
A. Carty's right to due process was violated when the State presented false and misleading testimony at trial, in violation of her rights to due process and due course of law under Giglio and Napue .
B. Carty's right to due process was violated when the State presented false and misleading testimony at trial, in violation of her rights to due process and due course of law under Chabot and Chavez .
C. Carty's right to due process was violated by the State's failure to disclose impeachment and exculpatory evidence in violation of Brady v. Maryland .
I agree that any claim of ineffective assistance of counsel based on Carty's counsel's failure to interview Charlie Mathis before trial and failure to solicit defense testimony from him is procedurally barred. As the federal district court pointed out, such testimony would have been cumulative of his trial testimony during the guilt phase. Only Mathis's second affidavit signed in 2014, asserting coercive tactics by the prosecution, is at issue here.
On May 5, 2016, the trial court signed an Order Designating Issues reciting the following factual issues that needed resolving:
1. Did the State coerce witnesses Chris Robinson, Marvin Caston, Charles Mathis, and Gerald Anderson to submit false testimony?
2. Did the State withhold or misrepresent statements from Chris Robinson, Marvin Caston, Gerald Anderson, and Charles Mathis?
3. Did the State fail to disclose notes and recorded interviews with witnesses or potential witnesses?
4. Did the State fail to disclose preferential treatment to Marvin Caston in exchange for his testimony against the applicant?
D. The Habeas Hearing Testimony
1. Habeas Testimony of Charlie Mathis
Charlie Mathis testified to the following at the habeas hearing:
• On the morning of May 16, 2001, Mathis noticed that he was getting a call from Carty, but he did not answer it because he was on another call. He did, however, answer the call from Lt. Smith.
• He drove to HPD and met with Lt. Smith. He said he was "very shocked that they had Linda there."
• Mathis also said that he thought it was a "big mistake" because "Linda was not a violent person."
• Then he talked to Carty and asked Lt. Smith if they had read Carty her Miranda rights. Mathis said that they did not because they did not want Carty to "lawyer up."
• Mathis was very concerned about the kidnapping and wanted to help find the mother and baby.
• He was surprised at Carty's involvement but as he interviewed her he could tell she had knowledge of it.
• He gave the location of the mother and baby to the officers and he was surprised that they did not immediately go to the location.
*163 • After Mathis's initial interview with Carty he had several subsequent visits with Connie Spence.
• Mathis said he explained to Spence that he did not believe Carty was guilty of murder; that he had known Carty for a number of years; that she was not violent, and that she was not dominant enough to control these criminals.
• Mathis told Spence that he did not want to testify against Carty.
• Mathis said Spence then asked him if he was having a sexual affair with Carty. He did not see that as an innocent question. He saw it as a threat.
• Mathis said his testimony at trial was truthful, but limited.
• Mathis said "I believe Linda was involved in this crime in some form or fashion, but I don't believe that she killed the woman."
• Mathis was then asked, "You know there was a law of parties instruction in the jury charge?" Mathis did not know what that meant.
2. Habeas Testimony of Chris Robinson
On direct examination by Carty's attorneys, Chris Robinson said he was not there to testify for Linda Carty. He said he was there because the prosecutors "overstepped their boundaries the way they handled this case." He testified that he was there to tell the truth. Then the State began its cross examination of Robinson:
Q. So, the first statement you gave regarding Linda Carty was on May 17th, 2001 at about 3:00 in the morning. Right?
A. That's what it says right there.
Q. Do you remember talking to Deputy Novak?
A. Yes.
Q. The second one-and then you gave a second statement, right, the same day around 3:00 in the afternoon again to Novak, right?
A. That's what it says, yes.
* * *
Q. Then you testified at the Linda Carty trial, right?
A. Right.
Q. Okay.
A. Yes.
Q. Then you testified in the Carlos William [sic ] trial, right?
A. Right, yes.
Q. And you testified to the same set of facts in the Carlos [sic ] Williams trial that you testified to in the Linda Carty [sic ], right?
A. Yes.
Q. Okay. Including the fact that you saw Linda Carty pulling a bag over Joana Rodriguez's head, right?
A. Right.
Q. Then you testified-then you were sentenced, right, in your PSI hearing? Remember that?
A. Yes.
Q. And isn't it true that at your PSI hearing you testified: Linda Carty duked me off into believing something was in there that wasn't.
* * *
Q. You gave an interview in a documentary, right?
A. Right.
Q. Okay. And you told Werner Herzog that it was time to tell your side of the story, right? Right?
A. Right.
* * *
Q. You told Werner Herzog: Like Linda told me, we're in this together. If I *164 go down, you go down. She wasn't lying. Did you say that?
A. Yes.
Q. And isn't it true you said-you told the director: My understanding was it was Linda. From what I've seen, it was only [Rodriguez] and Linda. Everyone else had left. It was only her and Linda. And when we come back, that was it. That's what you told the director, didn't you?
A. [I]f that's on the tape, then I said it.
* * *
Q. ... And you said-you told Linda-when you got back to the Hampton Inn, you told the director: I told her that's what this is all about.... "From that point there, I wanted to kill Linda." ... You told him: I probably should have done it the first chance I got. I probably would have saved the lady's life. Right?
A. Yes, I said that.
* * *
Q. And your side of the story, again, if you had killed Linda, the lady would be alive, right?
A. Pretty much, yes, sir.
Q. And yet, you write in your affidavit that Josie Anderson was the ringleader.
A. Well, Jose [sic ] was the one who introduced us to Linda. So, I didn't know-nobody else knew Linda but Josie.
Q. But Josie didn't go to the lick the second night, did she?
A. Well, she went-no, she didn't.
Q. She didn't, right. Josie didn't have that baby at that motel room, right?
A. No.
Q. Okay. You say in your affidavit ... "Connie Spence and Craig Goodhart threatened me and intimidated me, telling me I would get the death penalty myself if Linda Carty did not get the death penalty. They told me I had to testify at Linda's trial to avoid the death penalty, and they made it clear what it was I had to say." Do you see that?
A. Yes.
* * *
Q. Okay. I want to make sure I understand all of the false statements that you say Connie and Craig forced you to make. Okay? "Linda didn't instruct us to kill all the guys in the apartment." Is that one of them?
A. Well, this is-there was so many different interviews with Connie and Craig Goodhart.... I just can't pinpoint exactly one different statement that would make it-make it seem better than what it is. If you say what did they say about what part of threaten-okay-well, you say-well, when you went-when you went to the motel room and left a fingerprint on the newspaper that I was supposed to read off the sports page, a lot of stuff was not true.
Q. Okay. Let me ask you-
A. I don't remember any of that.
Q. But you were in the hotel room, right?
A. Yeah.
Q. Linda had all that baby stuff there?
A. Yeah.
Q. I will point you to the direction of one specific one. I'm looking at Paragraph 18.... "Another example was adding a detail that Linda had instructed us to kill all the guys in the apartment during the lick.... The truth is, Linda didn't instruct us to kill all the guys in the apartment. This was a detail that got included at trial *165 through the various rehearsals with the district attorneys." Right?
A. Yes.
Q. Okay. And that's specific to the district attorneys, right?
A. Yes.
Q. Okay. Isn't it true that when you spoke with deputy Novak during your first interview that-
A. I said the same thing.
Q. Well, actually isn't it true that she said she wanted everyone else dead?
A. Yes. That's what I told-I told Novak.
Q. You told Novak that, right?
A. Yeah.
Q. That Linda Carty wanted everyone else in the apartment dead, right?
A. Right.
Q. Okay. Connie Spence and Craig Goodhart weren't involved in the case yet, right?
A. Well, not to my knowledge.
Q. Right. But, according to your affidavit in Paragraph 15, that specific detail got added through the various rehearsals with the district attorney. Isn't that what it says, Mr. Robinson?
A. Well, yes, it does say that.
Q. Okay. And so that was false, right?
A. Well, it's been stretched.
* * *
Q. Okay. At the Carlos [sic ] Williams trial, you testified, did you not, that everyone came back to Van Zandt Street, right?
A. Yes.
Q. It's you, Carlos [sic ], Baby G, talking about letting the victim go, right?
A. Yes.
Q. You all talked about killing Linda, right?
A. Yes.
Q. And then Zeb came out and he wanted everyone to leave, right?
A. Yes.
* * *
Q. Okay. You went to your baby's mama's house to drop off some money?
A. Yeah.
Q. Came back at 3:00 in the morning? ... Okay. You don't remember the time frame because it's so long ago, right?
A. Yeah.
Q. Okay. And Linda is still there, right?
A. Yes.
Q. Okay. And you testified at the Williams trial that you saw Linda pulling the bag over the head, right?
A. Well, I testified I saw the bag over her head. I can't say that I saw her pull the bag over the head.
* * *
Q. Did you put the bag over her head?
A. No, I didn't.
Q. Did Carlos [sic ]?
A. No.
Q. Okay. Baby G?
A. No.
Q. Zeb?
A. No.
Q. Who?
A. Well, Linda was the only one out there.
Q. Exactly....
3. Habeas Testimony of Marvin Caston
Caston testified to the following on direct examination during the habeas hearing:
Q. Now, Mr. Caston, I want you to tell us in your own words, when you met *166 with Connie Spence and Craig Goodhart on those visits, did they ever threaten you to get you to tell a story?
A. Yes.
Q. Okay. I want your words. Tell me-tell me what they said to you and what you-tell us the story?
A. Okay. One day I was at my sister's house, but I was leaving my sister's house. So, I just start seeing-I seen the lady before, but I was like this can't be the lady that's chasing me right here. And it was Connie Spence and Mr. Craig, whatever. So, I was like-so, they were at my sister's house and we was sitting at the table. And Mr. Craig, he had seen some marijuana in the ashtray. I was like: You know I could take you to jail for this, right? So, I was like, man. I really wasn't-so, they started asking me questions like about Ms. Linda and other people. Then he was like: If they don't get the death penalty or a life sentence, I was going to get 30 years. So, they had me scared. You know what I'm saying, at the time, because I'm not knowing what was the right thing to say. So, they start telling me on this such and such date did this happen. So, I was under the influence of drugs at the time. So, they asked me-and they give me the date. It's playing in my mind that the dates-that's supposed to be date, but it's really like I don't know.
* * *
Q. And did Ms. Spence and Mr. Goodhart make any other threats to you that day?
A. Yes, sir.
Q. And what were those?
A. If Linda McCarty [sic ] and Chris Robinson didn't get a life sentence or a death penalty, I was going to get 30 years.
Q. Did that scare you?
A. Yeah, because I was like for what. I didn't do anything. I'm being honest with them. I'm telling them what I know.
* * *
Q. Okay. Okay. And Mr. Caston, were you involved either a day or a week before this incident happened in terms of perhaps going to do this lick?
A. I was hanging around with them at the time.
Q. Okay. And did you actually drive out to do the lick?
A. Well, it wasn't like drive out to do a lick. It was a drive out to go visit Linda's house. And she-by us being there, she showed us Ms.-I think her name was Ms. Rodriguez, whatever, where she stayed.
Q. Right.
* * *
Q. Okay. Who was the person-well, you say in here Josie Anderson brought up the lick first. Is that true?
A. Yes, but I made a mistake and said Linda, but it wasn't Linda. It was Josie.
On cross-examination, Caston testified as follows:
Q. Mr. Caston, aside from that mistake that you said at trial-and you testified it was a mistake, right? And that was who brought up the lick first, right?
A. Uh-huh.
Q. The rest of your testimony at trial was truthful because you were there to tell the truth, right?
A. Yes, sir, but for the times and the dates and the ....
Q. Right. You got a little confused about the times and the dates, right?
A. Uh-huh.
*167 Q. And you're saying you testified falsely or wrongly about who brought up the lick first, right?
A. It wasn't false. I wasn't trying to be falsely about it, but it was at the time my mind was just racing, so ....
* * *
Q. Mr. Caston, isn't it true that you told me, when I interviewed you, that Linda Carty said she was going to cut the baby out?
A. That's true.
Q. Isn't it true that you told me Linda Carty said: I'm going to cut the baby, cut the bitch's stomach open; ya'll know what I'm saying?
A. Not cut the baby, though.
Q. Okay. Cut the baby out?
A. Yes.
* * *
Q. Isn't it true that you told me or confirmed Linda was the one organizing people to try to rip the baby out?
A. No. She wasn't trying to get nobody to rip the baby out. She said she was going to cut the baby out herself.
Q. Linda said she was going to cut the baby out herself?
A. Yes.
Q. Okay. And isn't it true that you told me: Linda said her husband was having an affair and she was going to take the baby from the bitch?
A. Yes.
Q. And isn't it true that you told me Linda was the person who was organizing the stuff for the drug lick?
A. Yes, but Josie played a role, too. That's what I'm trying to explain to you.
Q. So, Josie and Linda-what you are telling the Court right now-they both played a role in the drug lick?
A. Yes.
* * *
Q. Okay. But you weren't there for the drug lick, were you?
A. No, sir.
Q. Because you backed out?
A. Yes, sir.
Q. Because you freaked out because you wanted no part of anything where any baby was being taken out of a stomach, right?
A. Yes, sir.
Q. Right? And you don't know if Josie was there or not?
A. I don't.
Q. And you really have no idea as to what happened in that apartment because you weren't there, right?
A. That's right.
* * *
Q. Isn't it true you told me Linda said: When ya'll go in there, I'm going to go get the chick; don't worry about the chick?
A. Yes.
4. Habeas Testimony of Gerald Anderson
At the habeas hearing, Gerald Anderson testified that Connie Spence tried to pressure him into testifying in Linda Carty's trial. He said that Spence told him she knew he "didn't do it," but she felt he knew more than he was telling her, so if he didn't testify against Linda Carty she would build a case against him "because of his priors." Anderson said that when he was arrested for the capital murder of Joana Rodriguez, the police came to his house, he had been arguing with his wife, and he was intoxicated. The police told him they had been told he was involved and he told the police that he "wasn't involved in anything." He said he told Connie Spence that he "wasn't there." He said that Spence "knew that I was present and *168 something about the lady said about cutting a baby out of somebody. I told her that I don't know nothing about cutting no baby and taking no baby out of nobody." Anderson said that Spence told him "to come forward and say the lady said she was going to take a baby out of somebody, take a baby. I told her: I can't say that because I wasn't present.... I told her I wasn't recruited by nobody to do nothing." Anderson was then asked,
Q. I've got to ask you, Mr. Anderson: What was your involvement in the whole Joana Rodriguez case? Just tell us what it was, if any, or none. Just tell us.
A. Well, I know Mr. Robinson. You know, we drank codeine. I'd buy codeine from him. He said he needed a phone for-to take care of a lick. I told him okay. I gave him a phone and that was that.
* * *
Q. All right. And what did you tell the police the night that you were arrested, do you remember?
A. I told them I didn't have nothing to do with it. "What's up, what's going on?"
5. Habeas Testimony of Craig Goodhart
Craig Goodhart was one of the two prosecutors who are being accused of presenting false testimony and withholding Brady material. As to these two allegations, the significant portions of Craig Goodhart's testimony at the habeas hearing are as follows:
A. There was a materiality component to a Brady disclosure. So, one, did it affect guilt or innocence. And two, did it affect punishment in some material nature. I did not make those decisions as a general rule. I lived by what Johnny Holmes taught me.
Q. What did he teach you?
A. Don't be afraid of it, give it all up, argue to the jury later. And I always followed that rule to the best of my ability my entire career.
* * *
Q. And at that-in that case [the David Temple case], you took the position collectively as this team if you didn't believe the material, even though exculpatory, was true, you didn't have to disclose it?
A. I didn't take that position.
Q. Okay. So, that's a wrong position to take?
A. For me.
* * *
Q. All right. I'm sorry. Mr. Goodhart, I want to talk to you about another element of Brady, which is impeachment. Impeachment-do you agree that Brady requires the disclosure of impeachment evidence?
A. Yes.
Q. Okay. How do you define-or back in 2002, how did you define your obligations for disclosing impeachment evidence?
A. The same way I do now, the Johnny Homes' rule.
Q. What is the Johnny Homes' rule on disclosing impeachment evidence?
A. Give everything to the defense and argue it at trial to the jury.
Q. Give everything to the defense before trial, correct?
A. Yes.
* * *
A. I may have had different theories of how that case-of what happened based on all of the interviews I did and the physical evidence.
Q. I understand.
*169 A. And obviously I did have a different theory.
Q. What was the other theory?
A. Under the law of parties they were all guilty of killing this lady.
Q. Okay. Felony murder?
A. No, sir.
Q. Law of parties?
A. Law of parties. Everybody that participated committed the crime of capital murder.
* * *
Q. Do you recall in these eleven meetings discussing specifically with Chris Robinson changing his testimony from she was alive after the bag until when she's dead at trial?
A. Counsel, I've never manufactured testimony in my life.
Q. I understand, sir. My question is: Do you recall-
A. You know, I don't recall, but I'm telling you I don't do that.
Q. And what investigation can you tell me about did you do, that you can remember, as a prosecutor to try to resolve which one of these were true, alive or dead?
A. I would have done anything I had in my power to find out whether it was true or not true. And if I presented it, I believed it to be true.
6. Habeas Testimony of Connie Spence
Connie Spence testified at the habeas hearing that:
• She has no specific recollection of throwing anything away that pertained to the Carty trial.
• She has no explanation why Virginia Almanza, a victim-witness coordinator, would delete e-mails regarding Linda Carty.
• Her understanding of Brady is that "any evidence that is favorable to the defendant is to be turned over." That includes any evidence in her possession that a witness was either lying or changing their story. She testified that they "gave access to defense counsel at all times anything that she did not consider work product."
• Spence agreed that if she had some information that was exculpatory or impeachment, but it wasn't written down, it would still be something that she would turn over to the defense.
• Spence did admit that, back in 2001-2002, generally speaking, if she did not find the evidence credible, she would not turn it over to the defense. She believed she had a "gatekeeping" role to determine whether exculpatory evidence was turned over to defense counsel. She testified that the Michael Morton Act changed things and that, now, prosecutors do not have discretion regarding whether to turn over evidence to the defense.
• But, with regard to this particular case, Spence stated that they were very "open and upfront" with defense counsel regarding the witness testimony.
• Spence stated that she did not recall whether anything was specifically withheld from defense counsel in this case.
• Again, though, Spence stated that if she had information that someone else had put together this conspiracy and was the ringleader of this crime, she would have revealed that to defense counsel.
• Spence also said that it was her recollection that every single witness's statement that the D.A. had access *170 to was always in the open file and accessible to defense counsel.
• With regard to Chris Robinson, Spence agreed that he was an important witness because he was an "important piece of the puzzle." She said that she "believed his testimony to be crucial or very important, an integral part." When asked if she thought he was "critical" to their case, Spence testified that
his testimony put all the pieces together and certainly included Linda Carty being able to identify the place where the body was found, the baby was found in the car that were [sic ] rented to her and her daughter, her crazy story, and the fact that she was the connection between that apartment complex and the Van Zandt home. Yeah, Chris Robinson did put the pieces together that we wouldn't have otherwise known, but there was a lot of evidence that supported and corroborated what Chris said that was independent of Chris.
• Spence denied telling Chris that if Carty did not get the death penalty, he would.
• Spence denied threatening Chris with the death penalty.
• Spence denied insisting that Chris change his story or change his answer to a question.
• Spence denied rehearsing testimony with Chris Robinson. She insisted that they "specifically told him to tell [them] the truth."
• Carty's habeas counsel continued to focus on the fact that, at one time, Robinson said that he tore at the bag over Rodriguez's head, and she was still alive, but at trial Robinson testified that when he saw Carty with the bag over Rodriquez's head and he tore at it, Rodriguez was already dead. Spence testified that she did not recall when or why he may have changed his story.
• Carty's habeas counsel also focused on the discrepancies in testimony regarding whether Carty actually entered the apartment or whether she remained outside. Again, Spence did not have any information regarding whether or when Chris changed his position on that issue.
• Regarding Zebediah Comb, Spence testified that he was "important because he was there." She agreed that Comb admitted that he knew Rodriguez was in the trunk, and he admitted seeing her in the trunk, but Comb could not have been charged because the evidence did not show that he was chargeable as a party.
• Spence did not recall promising that if Comb testified she would dismiss his gun charge. Spence also did not remember making a deal with Comb about his federal charge.
• Regarding Marvin Caston, Spence said he was another piece of the puzzle. She recalled that
when Linda went to Josie and asked her if she knew of anybody who would want to do a lick for a lot of money, Josie led them to Junebug (Marvin Caston) and others. [Caston] went on a dry-run with Chris Robinson and Josie and Linda Carty to the complainant's apartment maybe a day-sometime before the actual event went on. Between that dry-run and the actual event, he hinged up and backed out of the deal.
• Regarding Charlie Mathis, Spence denied saying anything to Mathis about him having an affair with Linda Carty. She said she had never heard whether Mathis had an affair with any confidential informant, and *171 she never spoke to anybody about whether or not Charlie had an improper relationship with Linda Carty.
• Regarding Gerald Anderson, Spence testified that she did not recall interviewing him. She stated, however, that she knows she did not tell him that if Linda Carty did not get the death penalty that he would get convicted and sentenced to 30 years. Spence said that she would not have told him that because that is "not conducive to him being cooperative.
• On cross-examination by the district attorney, Spence testified as follows:
Q. You were asked on several occasions regarding corroborating evidence, right-
A. Yes.
Q. -today? Okay. And I think we can agree that there was a host of corroborating evidence in this case, correct?
A. Yes.
Q. Both Carlos [sic ]-related to Ms. Carty, right?
A. Yes.
Q. Both Josie and Marvin Caston said that Linda Carty wanted to cut the baby out of the bitch, right?
A. Yes.
Q. She made statements to a neighbor that she was about to get a baby?
A. Yes.
Q. She made odd statements to Charles Mathis?
A. Yes.
Q. She bought medical supplies?
A. Yes.
Q. And the only connection between Van Zandt and the housing complex is Linda Carty living there, right?
A. Yes....
* * *
Q. Did you fail to disclose a deal with Zeb Comb to Jerry Guerino or Windi Akins?
A. No.
Q. Would you have interviewed a witness without the attorney present?
A. Well, if the witness had an attorney.
Q. If the witness had an attorney, you wouldn't interview them without the attorney there, right?
A. Correct.
Q. With regard to possible deals for Zeb Comb with the assistant U.S. attorney, you researched e-mail traffic about that?
A. Yes, I did.
Q. With your more than 20 years as a prosecutor, have you ever been able to tell an assistant U.S. attorney of the Federal Government what they should do?
A. No, sir.
* * *
Q. I'm showing you what's been admitted as Applicant's 54. The first paragraph: Junebug is surprisingly cooperative after I assured him I was not interested in him as a defendant. Do you see that?
A. Yes, sir.
Q. You didn't offer him a deal, did you?
A. No, sir.
* * *
Q. So, there was no deal with Marvin Caston?
A. No, there was no deal.
Q. Under the law of parties, it wouldn't have made a bit of difference *172 whether Linda Carty came in or not, right?
A. That is correct.
* * *
Q. Ms. Spence, did you coerce or pressure any witness in this case to testify falsely?
A. No, sir.
Q. Did you coerce or force or threaten Charlie Mathis to testify in this trial?
A. No, sir.
ANALYSIS
A. Claims A & B: The Presentation of False and Misleading Testimony
As a general rule, the State's use of material false testimony violates a defendant's due process rights. In cases involving the State's knowing use of false testimony in violation of due process, an "applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment."[20] Under the standard set by the Supreme Court in Napue v. Illinois ,[21] a State's knowing presentation of false testimony will result in a new trial for the applicant if there is "any reasonable likelihood that the false testimony could have affected the jury's verdict."[22] The Supreme Court continued to use the Napue standard in Giglio v. United States ,[23] wherein it held that the State knowingly used false testimony, and such false testimony was material in that it could in any reasonable likelihood have affected the judgment of the jury.
However, an applicant's due process rights can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly.[24] In Ex parte Chabot[25] we held for the first time that the admission of false testimony could violate an applicant's due process rights even when the State was unaware at the time of trial that the testimony was false.[26] "False" testimony is testimony that, "taken as a whole, gives the jury a false impression."[27] Testimony gives a false impression when a "witness omitted or glossed over pertinent facts."[28] In Ex parte Chavez ,[29] we held that testimony need not be perjured to constitute a due process violation. It is sufficient that the testimony was false. Thus, a Chabot claim has two essential elements: the testimony used by the State was false, and it was material to the applicant's conviction. To show that the State's presentation of false testimony is material, an "applicant has the burden to prove by a preponderance of the evidence that the *173 error contributed to his conviction or punishment."[30] This is done by showing that there is a "reasonable likelihood that the false testimony affected the applicant's conviction or sentence."[31] The standard of materiality is the same for knowing and unknowing use of false testimony.
In this case, the habeas court found, based on the trial record and evidence presented during the habeas proceedings, that Carty failed to demonstrate that the prosecution threatened or coerced witnesses Robinson, Caston, Mathis, and Gerald Anderson into testifying falsely during Carty's capital murder trial.
Regarding Robinson, on the day after the murder, police interviewed Robinson. Among the details of the offense he relayed in his interview were that Carty manipulated him and two other men into robbing what they thought was a dope house so that Carty could kidnap the baby, which she told them was her husband's child. Robinson told police that they kicked down the door and hogtied the occupants. Carty then called one of the other robber's cell phones and told him to get "the package," which Robinson assumed was the baby. He said that Carty told him and the others to kill the occupants of the apartment. Carty then took the baby, one of the men put the baby's mother (Rodriguez) into the trunk, and they went to Robinson's grandmother's house. Robinson told police in the initial interview that Carty tried to kill the woman by suffocating her. Spence and Goodhart did not speak to Robinson until after police had interviewed Robinson. The habeas court found that Robinson's version of the incident told in his initial police interviews-before he ever met with Spence or Goodhart-was consistent with his trial testimony. Thus, the habeas court found that Carty failed to show that Robinson was coerced by the prosecution into providing false and misleading testimony at Carty's trial. The habeas court found that Robinson's trial testimony was consistent with and corroborated by other witnesses who never have recanted their trial testimony-Josie Anderson, Marvin Caston, and Zebediah Comb. During the writ hearing, Robinson was unable to specify or articulate any portions of his trial testimony where he presented false testimony or where he felt threatened into testifying in a particular manner. The habeas court found that Spence and Goodhart's habeas testimony-that they did not collude with Robinson or coerce him to present false testimony-was credible. The habeas court found that Robinson's assertions contained in his 2014 affidavit were "suspect and unpersuasive" given his admissions during the writ hearing that the statements in his habeas affidavit were "stretched." Thus, the habeas court found unpersuasive Carty's claim that the prosecutors presented false testimony through Robinson. The record supports these findings.[32]
*174 With regard to Marvin Caston, the habeas court found that Caston's trial testimony regarding the events leading up to the incident was consistent with and cumulative of the testimony presented by witnesses Josie Anderson and Zebediah Comb, both of whom have not recanted their testimony. The accuracy of Caston's memory was presented at Carty's trial for the jury's consideration. Moreover, Carty has failed to establish that the State coerced Caston into presenting false and misleading testimony. Caston testified at the habeas hearing that his trial testimony was truthful, but for his confusion regarding dates and times. Thus, the habeas court found unpersuasive Carty's claim alleging that the prosecution presented false testimony through Caston. The record supports these findings.
With regard to Charlie Mathis, the habeas court found that Carty failed to demonstrate that the State presented false and misleading testimony from Charlie Mathis. Mathis said at the writ hearing that he testified truthfully and honestly at Carty's trial. The habeas court did not find Mathis's claims that Spence threatened or coerced him to be credible. The record supports these findings.
Finally, with regard to Gerald Anderson, the habeas court found that, because Gerald Anderson did not testify during Carty's capital murder trial, Carty failed to demonstrate that the State presented false and misleading testimony through Anderson. The habeas court found unpersuasive Anderson's assertion that he was threatened and/or coerced by Spence.
All of these findings are supported by the record. The habeas court concluded, and I agree, that the evidence presented by Carty to support her claim that the prosecution presented false testimony is not credible. "This Court ordinarily defers to the habeas court's fact findings, particularly those related to credibility and demeanor, when those findings are supported by the record."[33] Carty's claim that witnesses were coerced and/or threatened by the prosecution has not been established with credible evidence. Therefore, I agree that Carty's claims fail under both Giglio and Chabot because she has not shown that the testimony at issue was false, misleading, or material. Even if we were to assume Robinson and Caston gave false or misleading testimony, it was not material.[34] Ultimately, it did not matter whether Carty was the ringleader, whether Carty entered Rodriguez's apartment, whether Robinson actually saw Carty put the bag over Rodriguez's head, or even whether Rodriguez was dead when Robinson tore the plastic bag that was wrapped around Rodriguez's head. Carty was convicted as a party to capital murder, and none of the evidence eliminates her or even casts reasonable doubt on her role as a party to this offense. Because the trial court's findings are supported by the record, I agree that Claims A and B should be denied.
B. Claim C: Withholding of Brady Material
In Brady v. Maryland the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process *175 where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[35] "The State's duty to reveal Brady material to the defense attaches when the information comes into the State's possession, whether or not the defense requested the information."[36] Giglio v. United States extended the rule in Brady to include impeachment evidence as well as exculpatory evidence.[37] To establish entitlement to a new trial based on Brady violation, a defendant must demonstrate that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.[38] Furthermore, the Supreme Court in Kyles v. Whitley explained that the materiality of suppressed evidence is considered collectively, rather than item by item.[39] The Supreme Court has, since Kyles , reemphasized the importance of evaluating materiality cumulatively.[40]
The habeas court agreed that the State was operating under a misunderstanding of Brady at the time of the Carty trial. The habeas court found that, at the time of Carty's trial, the prosecution did not believe that impeachment or exculpatory evidence needed to be disclosed if the prosecutor did not find the testimony credible. This finding is supported by Spence's testimony, but it is not supported by Goodhart's testimony. Goodhart testified that he did not operate under that policy. Spence, however, mistakenly believed that she did not have to turn over evidence favorable to the defense if she did not find the evidence credible.
The habeas court found that several witness statements and interview transcriptions were not disclosed to the defense prior to trial. The main points of contention were whether Robinson saw Carty placing the bag over Rodriguez's head, whether Rodriguez was alive or dead when Robinson tore open the bag, and whether Carty went inside Rodriguez's and Cabrera's apartment during the lick. At trial, Robinson testified that Carty "had the bag over the lady's head," that Rodriguez was not breathing when he tore open the bag, and that Carty came in through the front door as Robinson was exiting the apartment during the lick.
There were three statements given by Robinson. One videotaped statement of Robinson was provided to the defense during trial and counsel was able to use it to impeach Robinson's credibility on these matters. On cross-examination, defense *176 counsel got Robinson to admit that he told the police in the videotaped statement that Carty did not enter Rodriguez's apartment. Defense counsel also got Robinson to admit that he told police that when he opened the trunk the next morning, he saw Rodriguez with a bag over her head and tore a hole in it so she could breathe. Further, defense counsel pointed out that Robinson told the police in his statement that he did not know Rodriguez was dead until the police came and opened the trunk. Defense counsel also used this statement to point out that Robinson told police conflicting information about when Carty was at the Van Zandt residence, whether Robinson knew the people involved, who brought Rodriguez and the baby out of the house, and how Carty got to the hotel. With regard to the two Robinson statements that were not turned over to the defense, these were mostly consistent with the statement he gave that was turned over. Any inconsistencies could have been used for impeachment, but I agree that they were not material because they were not significant enough to have changed the outcome of the trial.
The habeas court also found that the State withheld impeachment evidence because it failed to disclose the details of a deal with Caston. However, it ultimately concluded that such evidence was not material. Although there were no formal "deals" entered into between the prosecution and Caston, Robinson, and Josie Anderson, it was more than likely communicated to them that they would benefit by cooperating with the State. To represent to the defense, to the court, and to the jury that there were no deals, and thus no incentive for the witnesses to testify favorably for the State, is somewhat misleading. Nevertheless, as to Caston and Josie Anderson, Carty's defense lawyers would have been able to cross examine them about whether or not they had been charged by the State at the time of Carty's trial. The existence of an incentive to testify favorably for the State could have been explored and argued by defense counsel. Thus, I would not be able to conclude that the State "withheld" this information, or conclude that this is "new" evidence, and I would not conclude that it was material.
The habeas court found that the State withheld Gerald Anderson's written statement. In that statement, Gerald Anderson says that Robinson brought Rodriguez and the baby out and that Carty waited in her car. If this statement had been produced, defense counsel could have impeached Robinson's testimony. However, the habeas court also found that such evidence was not material. The testimony of Cabrera and Cardenas confirmed that three men entered the apartment and a woman who was waiting outside called one of them on a cell phone. Neither of them said anything about a woman being in the apartment, so their testimony discounted Robinson's story to the extent that he said that Carty came inside the apartment. Moreover, defense counsel got Robinson to admit that he told police in his statement that Carty did not enter the apartment. Therefore, that impeachment evidence was before the jury even without Gerald Anderson's statement. The record supports the trial court's finding that the evidence was not material.
The habeas court concluded that, "in light of the entire body of evidence presented, including the trial testimony," there is no reasonable likelihood that it could have affected the jury's verdict. The record supports this conclusion. Individually, each piece of undisclosed evidence is not material. Even cumulatively, the evidence is not material. Even if the statements by Robinson, the deal with Caston, and Gerald Anderson's written statement were all disclosed to defense counsel, there *177 is no reasonable likelihood that the jury's verdict would have changed. Even if defense counsel had been able to further impeach Robinson by exposing inconsistencies in his statements, it would not have changed the outcome. And, with or without disclosure of the deal with Caston, defense counsel could have cross-examined Caston and Josie Anderson about whether or not they had been charged by the State at the time of Carty's trial, and defense counsel could have explored and argued to the jury the existence of an incentive to testify favorably for the State. There was overwhelming evidence of guilt admitted at trial that was not subject to impeachment.
Finally, the withheld witness statements were not exculpatory. Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt.[41] None of the witnesses stated that Carty was not involved in the murder. While the withheld witness statements may have contained inconsistencies that could have been brought out at trial to impeach those witnesses, none of those statements contained information justifying, excusing, or clearing Carty from the alleged guilt, or eliminating her as a party to this offense.
Because the withheld information was not exculpatory, and because of the overwhelming evidence of guilt admitted at trial that was not subject to impeachment, I agree that the cumulative effect of all the withheld Brady evidence was not material. There is not a reasonable probability that, had the undisclosed evidence been disclosed to the defense, the result of the proceeding would have been different. I agree that Claim C should also be denied.
THE MOTION TO REMAND
After the evidentiary hearing, Carty's habeas counsel filed a Motion for Remand And, Alternatively, Motion to Stay. That motion asks this Court to remand the case for consideration of specific due process violations "uncovered shortly before and during the evidentiary hearing due to the State's improper and dilatory tactics." Carty alleges in this motion that one month prior to the evidentiary hearing ordered by this Court the State produced emails that the State had previously claimed did not exist and that contained evidence that should have been disclosed years earlier. Carty claims that, through the e-mails and through Connie Spence's testimony at the habeas hearing, Carty learned that the State failed to disclose deals made with Zebediah Comb.
The trial court did not consider claims related to Zebediah Comb because such claims had not been raised in the writ application and were not the subject of this Court's earlier remand order. The trial court believed them to more properly be the subject of a subsequent writ.
In Carty's motion for remand, she asserts that Connie Spence hid from Carty's counsel the existence of a deal that she entered into with Comb that she would intervene on his behalf with the federal authorities in an effort to reduce his sentence on a federal charge if he cooperated and testified for the State in Carty's trial. In addition, there was a second deal struck with Comb for the dismissal of a felon in possession of a weapon charge brought by Spence and Goodhart against Comb in exchange for his testimony against Carty. Carty's habeas counsel asks this Court to issue findings on whether the State violated Carty's due process rights by presenting false testimony about deals with Comb and by failing to disclose the deals prior to the Carty trial.
*178 At Carty's trial, Zebediah Comb testified that the prosecution had not made a deal with him in exchange for his testimony:
Q. Now, Zebediah, you've got this case pending, this felon in possession of a weapon, this bank robbery case. Have I made you any promises in return for what you have testified to today?
A. No, ma'am.
Q. Have I threatened you or anything other than tell you to tell the truth?
A. Ma'am?
Q. Have I threatened you?
A. No, ma'am.
Q. What have I asked you to do always?
A. Just to tell the truth.
It is true that Spence's e-mails reflect representations that she may have made to Comb to encourage him to testify. However, there was no evidence of a concrete deal or arrangement entered into with Comb. In fact, in an e-mail from Connie Spence to Bill Delmore, dated May 2, 2002, related to the Williams trial, Spence states as follows:
This time around, I'm trying a different co-defendant (Carliss Williams). Witness [referring to Comb] has told me that he does not want to testify. He is quite antagonistic and openly hostile to me. (The reason for the change in heart is because the during [sic ] the last trial, he had not been sentenced in a federal matter. And, even though no deals had been made between me, him, or the AUSA ... he apparently held out hope that his cooperation in my case would help him out in his federal case. At any rate, he's been sentenced and is not happy with the time he got in the federal case. Therefore, now he's mad at everybody and anybody. Unfortunately, I REALLY need him.)
I don't really know what will happen at trial. I read him parts of his testimony from the prior trial and while he doesn't deny that what he testified to is true ... he won't say it either. If I ask him non-leading open ended questions, basically he'll just say, "I don't remember."
He's just very angry and doesn't want any part of this trial.
Spence and Goodhart both denied making any promises or threats to Comb to get him to testify, and Comb denied that there were any promises or threats by the State. Nevertheless, there was indeed a felon in possession charge pending against Comb when he testified for the State in the Carty trial in February of 2002, and the felon in possession charge was dismissed in March of 2002, shortly after Carty's trial. Thus, even though there was no evidence of a formal "deal" between Comb and the prosecutors, there was evidence that prosecutors may have provided Comb an incentive to testify for the State in Carty's trial. This information should have been turned over to the defense. In any event, however, for the reasons noted below, I agree with the Court that this Brady violation would not support a right to relief in this case.
First, I agree with the State that the issue of the Comb deal is a new claim that is not encompassed under Claim C in this subsequent writ application. In order for this Court to have jurisdiction to consider this claim, Carty would have to raise it by filing a third writ application in the trial court.
Second, the pending charges against Comb were ascertainable by Carty's defense counsel before Carty's trial. Carty's counsel had the opportunity to question Comb about his pending felon in possession charge. Even though Comb denied the existence of a deal, Carty's counsel could have argued in Carty's trial how Comb *179 may have been inclined to testify favorably for the State while the State had a case pending against him. Comb could have been impeached with this evidence even if the prosecution had not disclosed their conversation with Comb regarding the possible dismissal of Comb's gun case.
Third, Carty was convicted in February 2002. Before Comb testified in Carty's trial, the trial court questioned both Comb and his attorney, Charles Brown, about his pending state and federal charges and whether there were any deals. Both of them denied the existence of any deals. Comb's gun charge was dismissed in March 2002. He was sentenced in his federal case after Carty's trial and before Williams's trial. When Comb testified in Carliss Williams's trial in May 2002, Comb said that he testified truthfully in Linda Carty's trial. He also testified in Williams's trial that the State had agreed to dismiss his gun charge if he testified in the Carty trial. And, in fact, the gun charge was dismissed after Carty's trial. And, when questioned by the State about his federal charge, he responded: "You recommended if I testify against them, y'all would write a letter and tell them-talk to the U.S. attorney over there to give me a time reduction." Since all of this occurred before Carty's first application for writ of habeas corpus was filed in 2003, the factual basis of this claim was ascertainable through the exercise of reasonable diligence on or before that date. It would therefore be procedurally barred under Article 11.071 § 5(a)(1) and § 5(e). If Carty had filed the motion for remand in the trial court, instead of in this Court, then we could have labeled it as an "-03" writ and dismissed it pursuant to Article 11.071 § 5.
Finally, even if we were to look into the merits of such claim, I would conclude that the evidence of an "understanding" that Comb's gun case would be dismissed in exchange for his testimony was not material enough to have changed the outcome of the trial. Comb's testimony was consistent with the testimony given by other witnesses. This evidence was not exculpatory. Thus, I agree with the Court that Carty's "motion to remand" should be denied.
CONCLUSION
Habeas counsel has alleged that the prosecution committed egregious misconduct that entitles her to relief. The record does not support these habeas claims. The record supports the trial court's finding that the prosecution did not present false or misleading evidence. And, although the record supports the habeas claims alleging that the prosecution failed to timely disclose Brady evidence, the record also supports the trial court's conclusion that such evidence was not material. It is true that, in some cases, several instances of improper-withholding-of-evidence could have the cumulative effect of making such Brady violations material, even when no one violation is material on its own. However, this is not one of those cases. I therefore agree with this Court that the record supports the habeas court's conclusion that even if the withheld Brady evidence had been timely disclosed to the defense, the outcome of the proceedings would not have changed.
For the reasons outlined herein, I concur in the Court's decision to deny Claims A, B, and C; dismiss Claims D, E, and F; and deny Carty's Motion for Remand and, Alternatively, Motion to Stay.
Walker, J., filed a concurring opinion in which Hervey, J., joined.
CONCURRING OPINION
A majority of the Court finds that Applicant Linda Carty is not entitled to habeas corpus relief and denies her motion for *180 remand. Because I agree with the Court's disposition of this case for the same reasons that Judge Richardson describes in his concurring opinion, I concur with the Court's decision but join Judge Richardson's concurring opinion for all but Part B. I write separately to emphasize the proper analysis of whether undisclosed evidence is material to support a Brady claim.
I-Materiality of Brady Claims
The United States Supreme Court, in Brady v. Maryland , "[held] that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Thus, Brady is violated when three requirements are satisfied: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material.[1] Harm v. State , 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). "Favorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." Id. at 408 (citing Thomas v. State , 841 S.W.2d 399, 404 (Tex. Crim. App. 1992) ); United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682, 105 S.Ct. 3375 ; see also Ex parte Adams , 768 S.W.2d 281, 291 (Tex. Crim. App. 1989) (adopting Bagley standard of materiality). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley , 473 U.S. at 682, 105 S.Ct. 3375.
In Kyles v. Whitley , the Supreme Court expanded on Bagley 's standard and emphasized four aspects of materiality:
Four aspects of materiality under Bagley bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). Bagley 's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One *181 does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
Third, we note that, contrary to the assumption made by the Court of Appeals, once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo , that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," necessarily entails the conclusion that the suppression must have had " 'substantial and injurious effect of influence in determining the jury's verdict.' "
...
The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item.
Kyles v. Whitley , 514 U.S. 419, 434-36, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal citations omitted). The fourth aspect of Bagley described by Kyles , that materiality is considered collectively, and not item by item, deserves greater attention than courts sometimes give it, and it is for this reason that I write separately today. As Judge Richardson's concurring opinion notes, the Supreme Court has reemphasized this fourth aspect of Bagley materiality. Ex parte Carty , No. WR-61,055-02, concurring slip op. of Richardson, J. at 54 n.40 (Tex. Crim. App. Feb. 7, 2018) (citing Cone v. Bell , 556 U.S. 449, 473-74, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) and Wearry v. Cain , --- U.S. ----, 136 S.Ct. 1002, 1007, 194 L.Ed.2d 78 (2016) ). Just last term, the Supreme Court decided Turner v. United States , where it found that "the cumulative effect of the withheld evidence" was insufficient to undermine confidence in the jury's verdict in that case. Turner v. United States , --- U.S. ----, 137 S.Ct. 1885, 1895, 198 L.Ed.2d 443 (2017). Clearly, it is still good law that the materiality of withheld evidence must be considered cumulatively and not item by item.
Paradoxically, on the way to reaching the ultimate question of whether withheld evidence is cumulatively material, we necessarily must identify, describe, and consider each piece of withheld evidence individually. As the Supreme Court in Kyles noted, "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately." Kyles , 514 U.S. at 436 n.10, 115 S.Ct. 1555. Consideration of each piece of withheld evidence individually also makes sense from a "cumulative" effect standpoint. If any one improperly withheld item is found to be material on its own, Brady would be violated based on that one item, and the case would be subject to reversal because confidence in the verdict would, therefore, be undermined. The cumulative effect of one material item, combined with any number of non-material items, is obviously material by virtue of the finding that one item was material. If no individual item is itself material, reviewing courts should then look at the cumulative effect of all of the improperly withheld items of evidence. Even when no item in isolation is material, the combined, cumulative effect of multiple items can, in the right case, cross the Bagley standard of materiality, that there would be a reasonable probability the result of the proceeding would have been different.
*182 II-The Evidence is Not Material
Upon my own consideration of the entire, cumulative body of evidence in this case, I agree with the habeas court's conclusion as well as that of Judge Richardson in his concurring opinion that the undisclosed evidence is not material. While the statements by Robinson, the deal with Caston, and Anderson's written statement were all withheld and favorable to Applicant, individually they were not material. Cumulatively, if the defense was given the withheld evidence, there is not a reasonable probability that the result would have been different, and I am confident that Applicant still would have been convicted by the jury and Applicant still would have been sentenced to death. This is so because had the defense received all of the complained of undisclosed evidence, the only significant difference in the trial would be that defense counsel would have been able to further impeach Robinson by exposing inconsistencies in his statements. The additional disclosure of the deal with Caston and Anderson's written statement would have had little to no effect on the jury's deliberations for two reasons. First, defense counsel, with or without the Caston deal, could have cross-examined Caston and Josie Anderson about whether or not they had been charged by the State at the time of Applicant's trial, could have explored the existence of motive to testify against Applicant, and could have argued that fact to the jury. Second, defense counsel was already able to get the substance of Anderson's written statement before the jury when counsel got Robinson to admit that he told the police in his statement that Applicant did not enter the apartment.
Consequently, even if Applicant had been given all of the improperly undisclosed evidence, the most that could have been done was to convince the jury that much of the testimony of Robinson (and possibly even Caston and Josie Anderson) was not credible. Had counsel done so, and, for argument's sake, even convinced the jury that neither Robinson, Caston, nor Josie Anderson were credible at all, I believe Applicant still would have been found guilty and given the death penalty. There was overwhelming evidence of guilt showing that not only was Applicant connected to the crime,[2] but that she was a key player in the kidnapping and murder.
Zebediah Comb testified that Applicant "had a job" for the group to do involving a drug deal. "[F]or the drug deal she wanted a favor in return," which was for the group to "bring the lady to her" and Applicant was "going to handle it from there." Comb also testified that, after the kidnapping, Applicant said "I got my baby." Comb saw the victim in the trunk of Applicant's car. Applicant asked Comb to put the victim in another car parked in the yard, but he refused. Comb also testified that the group was angry at Applicant because there was no money or drugs in the victim's home. Comb told the group, including Applicant, to get in their cars and leave, but Applicant refused to drive her car with the victim in the trunk. He testified that when he woke the next morning, Robinson was there and Applicant arrived shortly thereafter driving a black Chevrolet with a baby in the car. He said that the victim's body was still in the trunk of Applicant's car, and Applicant talked about disposing of the body by burning it. Applicant left again and returned again two hours later with the baby. Comb further testified that he saw Robinson, Gerald "Baby G" Anderson, and Applicant put together *183 packets of fake and real money to rip off a dope dealer before Applicant and Robinson left with the baby in the Chevrolet while Anderson and another man left in a different car. Robinson returned about three hours later with the baby, which he left in the Chevrolet with the air conditioner running.
Florencia Meyers testified that she saw Applicant sitting in Applicant's car, at the apartment complex, the day before the kidnapping. Meyers testified that Applicant said she was going to have a baby the next day. Sherry Bancroft testified that Applicant had a storage unit and that, four days before the kidnapping, Applicant told her that she was in labor and expecting a baby boy. Bancroft said that she saw Applicant again on May 15, when Applicant told her that the baby was at home with his father, and Applicant left with a baby blanket and two sets of baby clothes. Denise Tillman testified that she sold to Applicant a number of medical supplies four days before the kidnapping. Jose Corona, who was described as both Applicant's boyfriend and as her husband, testified that they lived together for two and a half years. During that time, Applicant had a pattern of telling him that she was pregnant, but she would never actually give birth to a child. She would not take him to any doctors' appointments, and she never actually appeared pregnant. Corona testified that he eventually left after becoming tired of Applicant's lies, and that, the day before the kidnapping, Applicant called him many times to tell him that she was going to have a baby boy the next day. She also called him on May 16 to tell him that the baby would arrive that day.
After questioning by police, Applicant led the police to the house on Van Zandt where the baby was. The baby was found alive in a car owned by Applicant's daughter. Inside the car was a live 0.38 caliber round, a receipt from the Hampton Inn, the medical supplies Applicant had recently purchased, and numerous baby items. The victim was found in the trunk of Applicant's rental car that was also parked at the house on Van Zandt.
Clearly, disclosure of the improperly withheld evidence in this case, even if it would have cast doubt on Robinson, Caston, or Josie Anderson, would not have cast doubt on the accuracy of such critical and inflammatory information. I am convinced that all of this evidence shows that Applicant not only had a fixation on getting the baby, but had been planning the offense for some time. In the mind of the jury, this evidence would substantially outweigh the impeachment value of the improperly withheld evidence.[3]
III-Conclusion
In conclusion, the materiality of improperly withheld evidence should be considered first individually and then cumulatively. If the disclosure of one piece of said evidence, individually, provides a reasonable probability that the result of the guilt-innocence or punishment phase of the proceeding would have been different, then the Bagley standard is met and Brady would be violated. If no individual piece of evidence reaches that standard, all of the improperly withheld pieces of evidence cumulated together could reach the Bagley standard. However, even if the withheld evidence had been disclosed to the defense, given the overwhelming and inflammatory evidence in this case, my confidence in the outcome-that Applicant was convicted *184 and then sentenced to death-is not undermined. Accordingly, I concur in the result.

On September 30, 2008, the Federal District Court for the Southern District of Texas issued a lengthy opinion addressing Applicant Linda Carty's federal habeas writ. The federal court noted that this case "has a long and complex factual background," and it summarized in detail the extensive state and federal proceedings. Carty v. Quarterman , No. 06-614, 2008 WL 8104283 (S.D. Tex. Sept. 30, 2008).

Throughout the various pleadings and records associated with this case, Williams has been referred to as "Carliss" and "Carlos." For the sake of uniformity, we will refer to him as "Carliss Williams" or by his nickname, "Twin."

On direct appeal, Carty claimed that Chris Robinson, Josie Anderson, Marvin Caston, and Zebediah Comb were accomplices as a matter of law, and that the non-accomplice witness testimony was insufficient to support the conviction. Assuming, without deciding, that such witnesses were indeed accomplices as a matter of law, this Court held that, even without the testimony of the witnesses who were potentially accomplices, the evidence tended to connect Carty to the commission of the crime. Carty v. State , No. 74295, 2004 WL 3093229, *4 (Tex. Crim. App. April 7, 2004).

Chris Robinson was charged with capital murder, pled guilty to aggravated kidnapping, and was sentenced to 45 years. Gerald Anderson, who did not testify at Carty's trial, pled guilty to aggravated kidnapping and was sentenced to life. Carliss Williams was convicted by a jury of kidnapping, and he was sentenced to twenty years.

Carty v. State , No. AP-74, 2004 WL 3093229 (Tex. Crim. App. 2004).

Id. at *1 (citing Solomon v. State , 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) ). Texas Code of Criminal Procedure Article 38.14 provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

Id. at *6.

Ex parte Carty , WR-61,055-01 (Tex. Crim. App. Mar. 2, 2005) (not designated for publication).

Carty v. Quarterman , 2008 WL 8104283, at *31.

Id. at *36-37 (citing Styron v. Johnson , 262 F.3d 438, 449 (5th Cir. 2001) ).

Id. at *57-58.

Id. at *58.

Id.

Id.

Id.

Carty v. Thaler , 583 F.3d 244 (5th Cir. 2009).

Id. at 265. The Fifth Circuit pointed out that "Mathis's testimony would have been largely cumulative of his trial testimony. For example, Mathis testified during the guilt/innocence phase of trial that 'I've known Linda for a long time and I did not believe that she could do something like this.' " Id. at 265 n.15.

Carty v. Thaler , 559 U.S. 1106, 130 S.Ct. 2402, 176 L.Ed.2d 923 (2010), pet. for reh'g. denied , 561 U.S. 1039, 130 S.Ct. 3538, 177 L.Ed.2d 1116 (2010).

Ex parte Carty , No. WR-61,055-02, 2015 WL 831586 (Tex. Crim. App. Feb. 25, 2015). Texas Code of Criminal Procedure Article 11.071, section 5 provides, in pertinent part, that "[i]f a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that the current claims and issues have not been and could not have been presented previously in a timely initial application...."

Ex parte Fierro , 934 S.W.2d 370, 374 (Tex. Crim. App. 1996).

360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Ex parte Weinstein , 421 S.W.3d 656, 669 (Tex. Crim. App. 2014) ; Napue , 360 U.S. at 271, 79 S.Ct. 1173 ("[T]he false testimony could not in any reasonable likelihood have affected the judgment of the jury.").

405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Ex parte Robbins , 360 S.W.3d 446, 459 (Tex. Crim. App. 2011).

300 S.W.3d 768 (Tex. Crim. App. 2009).

Id. at 772.

Ex parte Chavez , 371 S.W.3d 200, 208 (Tex. Crim. App. 2012).

Robbins , 360 S.W.3d at 462.

371 S.W.3d 200 (Tex. Crim. App. 2012). "A witness's intent in providing false or inaccurate testimony and the State's intent in introducing that testimony are not relevant to false-testimony due-process error analysis." Id. at 208.

Chabot , 300 S.W.3d at 771 (citing Fierro , 934 S.W.2d at 374 ).

Chavez , 371 S.W.3d at 207.

As noted by Presiding Judge Keller in her dissenting opinion related to the Court's remand of this subsequent writ, see Ex parte Carty , No. WR-61,055-02, 2015 WL 831793, *3 (Tex. Crim. App. Feb. 25, 2015), Carty relies on "affidavits" submitted by four jurors who claim that, had they known about certain allegedly exculpatory facts contained in Robinson's affidavit, they would not have found Carty guilty of capital murder or assessed the death penalty. Actually, these "affidavits" are entitled "Declaration of Juror," and, although they are signed and witnessed, they are not notarized. Moreover, I agree with Presiding Judge Keller that these declarations are inadmissible under Texas Rule of Evidence 606(b) and cannot be considered. And, even if they could be considered, evidence of a juror's hindsight speculation stating that they would not have voted for guilt and/or death if the evidence had been different does not establish that no rational juror would have done so.

Ex parte De La Cruz , 466 S.W.3d 855, 865-66 (Tex. Crim. App. 2015) (citing Ex parte Navarijo , 433 S.W.3d 558, 567 (Tex. Crim. App. 2014) ).

See Weinstein , 421 S.W.3d at 665 (holding that false testimony is material if there is a "reasonable likelihood that it affected the judgment of the jury").

Brady , 373 U.S. at 87, 83 S.Ct. 1194.

Harm v. State , 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (citing Thomas v. State , 841 S.W.2d 399, 407 (Tex. Crim. App. 1992) ).

405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104.

Hampton v. State , 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

Kyles v. Whitley , 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ; see also Pena v. State , 353 S.W.3d 797, 812 (Tex. Crim. App. 2011) (citing Kyles ), and Ex parte Miles , 359 S.W.3d 647, 666 (Tex. Crim. App. 2012) (same).

See Cone v. Bell , 556 U.S. 449, 473-74, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) (Although the Court ultimately found that the undisclosed evidence was not material, it "[took] exception to the Court of Appeals' failure to assess the effect of the suppressed evidence 'collectively' rather than 'item by item[.]' "); Wearry v. Cain , --- U.S. ----, 136 S.Ct. 1002, 1007, 194 L.Ed.2d 78 (2016) (holding that "the state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively[.]").

Pena v. State , 353 S.W.3d 797, 811 (Tex. Crim. App. 2011).

If any one of these three is not met, for example, if the evidence is not favorable to the defendant, then there is no need to consider whether the evidence is material. At that point, there can be no Brady violation because one of the three requirements is missing.

See Carty v. State , No. 74295, 2004 WL 3093229, at *4 (Tex. Crim. App. Apr. 7, 2004) (holding that there was sufficient non-accomplice evidence to tend to connect Applicant to the commission of the victim's kidnapping and murder).

In many cases the analysis should be much more in depth and would have given a detailed analysis of exactly how an ably competent attorney would have used the undisclosed evidence and how such use would have affected the jury.